**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| H&R BLOCK EASTERN ENTERPRISES, INC., | * | |
| | * | |
| Plaintiff, | * | Case No. MJG-07-1822 |
| v. | * | |
| | * | |
| CHARLES W. TURNBAUGH, in his official capacity as Commissioner of Financial Regulation, | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

DOUGLAS F. GANSLER
Attorney General of Maryland

Jonathan R. Krasnoff (Bar No. 07880)
Assistant Attorney General
Maryland Office of the Attorney General
500 N. Calvert Street, Suite 406
Baltimore, Maryland 21202-3651
Phone No. (410) 230-6123
Fax No. (410) 333-6503
Email Address: jkrasnoff@dllr.state.md.us

*Attorneys for Defendant*

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Credit Services Businesses Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Block's Refund Anticipation Loan Activities . . . . . . . . . . . . . . . . . . . . . 5

    C.    The Previous Commissioner's Interpretation Of The CSBA . . . . . . . . . . . 5

    D.    Procedural History Of This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E.    Commissioner Raskin's Recent Advisory . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    The Commissioner's Recent Advisory Moots Block's
           Preemption Claim Pertaining To HSBC's Exportation Of
           The RALs' Interest Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.    None Of The Other Requirements Of The CSBA As Applied
           To Block Are Preempted By Either The National Bank Act Or
           OCC Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           1.    General Principles Governing Preemption . . . . . . . . . . . . . . . . . . . 13

           2.    The Presumption Against Preemption Of State Law. . . . . . . . . . . . 14

           3.    The Plain Words Of The National Bank Act Do Not
                   Support A Finding Of Preemption In This Case . . . . . . . . . . . . . . 16

4.    *Watters v. Wachovia* Provides No Support For A
Conclusion That The Actions Of Third-party Agents
Of National Banks Are Entitled To The Preemptive
Reach Of The National Bank Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5.    The OCC Regulations Cited By Block Do Not Support
A Finding Of Preemption In This Case  . . . . . . . . . . . . . . . . . . . . . 21

6.    The OCC And OTS Opinion Letters Cited By Block Provide
No Support  For Its Preemption Claim . . . . . . . . . . . . . . . . . . . . . . 24

7.    The Other Cases Cited By Block Do Not Support Its
Preemption Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.   The Tenth Amendment Precludes Reliance On OCC Regulations
To Find Preemption In This Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

### Cases

*Bahnmiller v. Derwinski*, 923 F.2d 1085 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Barnett Bank of Marion County v. Nelson,* 517 U.S. 25 (1996). . . . . . . . . . . . . . . . 14, 17

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Chrysler Corp. v. Brown*, 441 U.S. 281(1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Doe v. Kidd*, 501 F.3d 348 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Easton v. Iowa*, 188 U.S. 220 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*English v. Gen. Elec. Co.,* 496 U.S. 72 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Exxon Corp. v. Governor of Maryland,* 437 U.S. 117 (1978) . . . . . . . . . . . . . . . . . . . . . 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*
    528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528 (1987) . . . . . 33, 34

*Gregory v. Ashcroft,* 501U.S. 452 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hines v. Davidowitz,* 312 U.S. 52 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*Hopkins Fed. Sav. & Loan v. Cleary,* 296 U.S. 315  (1935) . . . . . . . . . . . . . . . . . . . . . 33

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mitchell v. Data General Corp.,* 12 F.3d 1310 (4th  Cir. 1993) . . . . . . . . . . . . . . . . . 10

*National City Bank of Indiana v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006),
    *cert. denied* 127 S.Ct. 2096 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

*New York Dept. of Social Services v. Dublino*, 413 U.S. 405 (1973) . . . . . . . . . . . . . . 15

*New York State Conf. of Blue Cross & Blue Shield v. Travelers Ins. Co.,* 514 U.S.
      645 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Overstreet v. Kentucky Central Life Ins. Co.,* 950 F.2d 931 (4th Cir. 1991) . . . . . . . . 10

*Pacific Capital Bank v. Connecticut,* 2006 WL 2331075 (D. Conn. 2006) . . . . . . 27-29

*Pacific Capital Bank, N.A. v. Milgram*, 2008 WL 700180 (D.N.J. 2008) . . . . . . . . . . . 31

*Pacific Gas & Elec. Co. v. State Energy Resources Conserv. and Develop.*
      *Comm'n,* 461 U.S. 190 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 28

*Powell v. McCormack*, 395 U.S. 486 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, (1963) . . . . . . . . . . . . . . . . . . . . . . 14

*Rice v. Sante Fe Elevator Corp.,* 331 U.S. 218 (1947) . . . . . . . . . . . . . . . . . . . . . 15, 33

*SPGGC, Inc. v. Blumenthal*, 408 F.Supp 2d 87 (D.C. Conn. 2006) . . . . . . . . . . . . . . 29

*SPGGC, LLC v. Ayotte,* 488 F.3d 525 (2d Cir. 2007), *cert. denied,*
      128 S.Ct. 1258 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . 29, 30

*State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207 (D.Conn. 2006) . . . . . . . . . . . 24

*State Farm Bank, F.S.B. v. Reardon,* 512 F. Supp. 2d 1107 (S.D.Ohio 2007) . . 24, 25, 26

*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 22

*Watters v. Wachovia Bank, N.A.*, 127 S.Ct. 1559 (2007) . . . . . . 12, 15, 18-22, 26, 31, 33

*Wells Fargo Bank, N.A. v. Boutris*, 419 F.3d 949 (9th Cir. 2005) . . . . . . . . . . . . . . . . . 22

## Constitutional Provisions

U.S. Constitution, Art. VI, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 34

U. S. Constitution, Art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Statutes

### Federal Statutes

12 U.S.C. 24 (Seventh) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12 U.S.C. § 1 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

### Federal Rules of Civil Procedure

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

### State Statutes

Chapter 469, Laws of Md. 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Chapter 561, Laws of  Md. 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Chapter 630, Laws of Md.  2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Md. Code Ann., Com. Law § 14-1901 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Md. Code Ann., Com. Law §14-1901(e)(1)(ii) and (iii) . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Com. Law § 14-1902(8) . . . . . . . . . . . . . . . . . . . . . . 4, 9, 11, 12, 16, 32

Md. Code Ann., Com. Law § 14-1903(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Com. Law § 14-1903(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Com. Law  § 14-1905(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Com. Law § 14-1906(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Com. Law  § 14-1907(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Com. Law § 14-1908 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Com. Law § 14-1911 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

Md. Code Ann., Com. Law § 14-1911(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Md. Code Ann., Com. Law § 14-1912. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Md. Code Ann., Com Law § 14-1915 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Md. Code Ann., Fin. Inst. § 11-303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., Fin. Inst. § 11-206(c)(1)-(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Md. Code Ann., State Gov't  §§ 10-201 - 10-226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## Regulations

## Code of Federal Regulations

12 C.F.R. Subpart D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12 C.F.R. § 7.1003(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12 C.F.R. § 7.1004(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12 C.F.R. § 7.4006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

12 C.F.R. § 7.4008(d)(2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

12 C.F.R. § 7.4009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

H&R BLOCK EASTERN                     *
ENTERPRISES, INC.,
                                      *

     Plaintiff,

                                      *     Case No. MJG-07-1822
    v.
                                      *

CHARLES W. TURNBAUGH, in              *
   his official capacity as
   Commissioner of Financial          *
   Regulation,

     Defendant.                    *

        *   *   *   *   *   *   *   *   *

## MEMORANDUM IN SUPPORT OF DEFENDANT'S PARTIAL MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, the Maryland Commissioner of Financial Regulation ("Commissioner" or "Defendant"), through undersigned counsel, files this Memorandum in Support of its Partial Motion to Dismiss and Cross Motion for Partial Summary Judgment, and requests this Honorable Court to enter a judgment finding that the Commissioner is not preempted from enforcing the Credit Services Businesses Act, Md. Code Ann., Com. Law § 14-1901 *et seq.* ("CSBA") against Plaintiff, H&R Block Eastern Enterprises, Inc. ("Block").

## INTRODUCTION

On July 11, 2007, Block filed suit against the Commissioner and petitioned this Court for declaratory relief and the issuance of an injunction to prevent the Commissioner from enforcing the CSBA against Block in connection with its facilitation of Refund Anticipation

Loans ("RALs") as an agent of a national bank, HSBC Bank ("HSBC").  The basis of Block's claim is that the National Bank Act and the regulations of the Office of the Comptroller of the Currency ("OCC") preempt Maryland law to the extent that the Commissioner attempts to regulate the agent of a national bank which assists customers to obtain RALs from the national bank.  Since the institution of this suit, the new Commissioner of Financial Regulation, Sarah Bloom Raskin, has issued an official Advisory which renders moot that part of Block's claim which pertains to a national bank's exportation of interest rates for loans that would otherwise be illegal in Maryland.   For the reasons set forth more fully below, there is no basis in the National Bank Act, the OCC regulations or existing case law to support a finding that the other regulatory aspects of the CSBA are preempted.

## UNDISPUTED FACTS

### A.    The Credit Services Businesses Act

The CSBA was originally enacted as Chapter 469, Laws of Md.1987 (introduced as House Bill 472).  "[The bill created] a new subtitle to regulate credit services businesses which accept fees for attempting to improve a consumer's credit record, history or rating, obtaining an extension of credit, or providing advice about either."   House of Delegates Floor Report on HB 472 attached hereto as Exhibit A.  Significantly, the CSBA gives the Commissioner the authority to license and regulate any credit services business, which is defined as any person that, "in return for the payment of money or other valuable consideration," assists a consumer to obtain a loan from a third party, or provides advice or

2

assistance in connection with obtaining such a loan.  Md. Code Ann., Com. Law ("CL") §14-1901(e)(1)(ii) and (iii). [1]

Pursuant to CL §§ 14-1903(b) and (c), a credit services business  must be licensed by the Commissioner and "is subject to the licensing, investigatory, enforcement and penalty provisions of this subtitle and Title 11, Subtitle 3 of the Financial Institutions Article."  CL § 14-1903(b).  In addition, under CL § 14-1908, a licensee must maintain a surety bond in the amount of $12,000.00 for the benefit of any person with a cause of action against the credit services business under the CSBA.  *See* Md. Code Ann., Fin. Inst. ("FI") §§ 11-303 and 11-206(c)(1)-(3).

With respect to specific transactions, the CSBA requires, among other things, a pre-contract disclosure statement which contains a "complete and detailed description of the services to be performed by the credit services business for or on behalf of the consumer, and the total amount the consumer will have to pay for the services."  CL § 14-1905(a)(5).  The contract must be in writing and include the terms and conditions of the payment, a complete and detailed description of services to be performed for the consumer, and the results to be achieved for the consumer.  CL § 14-1906(a)(3).  It is a violation of the CSBA if the credit services business breaches the contract and does not perform the agreed services.  CL § 14-

---

[1]       As the parties have stipulated for purposes of their Summary Judgment Motions, the Court may assume, *arguendo*, that Block meets the definition of a credit services business.  *See* Block's Memorandum in Support of Partial Summary Judgment ("Memo.") at 2, n. 2; 7, n. 8.

1907(a).  Willful noncompliance by a licensee may result in liability to the consumer for actual damages, a monetary award of three times the amount collected from the consumer, punitive damages, and, in a successful action, the costs of the action and reasonable attorney's fees.  Negligent noncompliance results in liability for actual damages, costs, and attorney's fees. CL § 14-1912.  The law also provides for criminal sanctions, including a fine of up to $5,000.00 under CL § 14-1915.

Pursuant to CL § 14-1911, the Commissioner has authority to investigate complaints which allege violations of the CSBA.  Subject to the contested case provisions of the Maryland Administrative Procedure Act, Md. Code Ann., State Gov't §§ 10-201 - 10-226, the Commissioner may hold a hearing on a complaint, and issue an order to cease and desist from a prohibited activity and/or require that restitution be made to an aggrieved consumer under CL § 14-1911(f).

In 2001 and 2002, the General Assembly amended the Act to prohibit a credit services business from assisting third-party lenders in the making of loans with interest rates in excess of the Maryland usury limits.  *See* Chapter 630, Laws of Md.  2001; Chapter 561, Laws of Md. 2002.  By amending CL § 14-1902(8), the General Assembly confirmed that if a lender compensates a third-party agent to assist Maryland consumers to obtain credit, the lender's agent is subject to the CSBA.  This prohibition is particularly relevant to Block's preemption claim in this case.  *See* discussion *infra* at 10-12.

4

B.      **Block's Refund Anticipation Loan Activities**

H&R Block Eastern Enterprises, Inc. is a Missouri corporation. *See* Retail Settlement

Products Distribution Agreement ("Agreement") attached to Schmidt Decl. as Block's Ex.

A.   Block is not a national bank and it is not an operating subsidiary of a national bank.

Furthermore, Block does not allege that it is in whole or in part owned by or controlled by

a national bank.

Instead, as accurately described in Block's recitation of the undisputed facts, Block

"is a tax preparation company that prepares and files income tax returns for its customers,

including Maryland consumers."   Block's Memorandum in Support of Motion for Partial

Summary Judgment ("Memo.") at 4.   Block acts as an electronic return originator ("ERO")

pursuant to procedures established by the Internal Revenue Service.   Block also "makes

available to its customers RALs issued by HSBC Bank." *Id.*   Furthermore, "Block offers

the RALs to potential bank customers in accordance with the instructions from HSBC Bank."

*Id.*  Block further acknowledges that it does the following:

> As HSBC Bank's agent, Block provides RAL applications to the
> bank customers and assists them in completing the application;
> provides customers with the other RAL-related disclosure
> documents and forms prepared by HSBC Bank; and prints and
> distributes loan disbursement checks from HSBC Bank to RAL
> customers.

*Id*., (citing Schmidt Decl. at ¶ 8; Ex. A to Schmidt Decl. at § 7.4).

C.      **The Previous Commissioner's Interpretation Of The CSBA**

In late 2006 and early 2007, the former Commissioner of Financial Regulation,

Charles W. Turnbaugh, and his staff began to evaluate the role of tax preparers, such as Block, in arranging credit in the form of RALs for their tax customers.  In a letter to Block dated January 4, 2007, Commissioner Turnbaugh stated that "[i]n light of the changes in [Block's RAL program], it is necessary for this Office to again conduct a review to assure compliance with applicable Maryland law."  *See* Letter of January 4, 2007, from Commissioner Turnbaugh to Mark A. Ernest, CEO of H&R Block, attached hereto as Exhibit B.  In the letter, Commissioner Turnbaugh also noted that if Block is paid a fee to assist a consumer to obtain a RAL, it is subject to the licensing requirements of the CSBA, and that Block is "prohibited from assisting a borrower with a loan if the interest rate on the loan exceeds the maximum rate permitted by Maryland law."  *Id.*

A Press Release dated January 9, 2007,  noted that former Commissioner Turnbaugh "is taking a closer look at [RALs]."  *See* Press Release of January 9, 2007, attached hereto as Exhibit C.  That  document  noted that "tax preparers arranging RAL's who receive a fee either from the lender or the consumer must have an installment loan license."  *Id.* Furthermore, the Press Release stated that although lenders "may have the right to export certain higher interest rates allowed by federal preemption of state law, [ ] Maryland statutes preclude the preparer from being compensated for obtaining such credit for the consumer." *Id*.

Despite the issuance of the Press Release and the letter to Block indicating the need to "conduct a review," Commissioner Turnbaugh never took any formal administrative action

6

against Block under CL § 14-1911, or any other provision of Maryland law.

In mid-January of 2007, Martin O'Malley took office as the Governor of Maryland. Soon thereafter, Thomas E. Perez was appointed as the new Secretary of Labor, Licensing and Regulation ("DLLR"), the executive Department within which the Office of the Commissioner resides. When this lawsuit was filed in July 2007, Governor O'Malley and Secretary Perez already had plans to choose a new Commissioner of Financial Regulation. After Block filed its Complaint, Secretary Perez informed this Court that he wanted the new Commissioner, Sarah Bloom Raskin, to re-evaluate Commissioner Turnbaugh's actions which gave rise to Block's lawsuit. In a letter dated July 18, 2007, to Brian H. Schmidt, Vice President/Corporate Counsel for Block, Secretary Perez stated, "I have asked the new Commissioner to re-examine the agency's interpretation as it may apply to transactions involving federally chartered depository institution lenders." July 18, 2007 letter from Secretary Perez attached hereto as Exhibit D.

### D.     Procedural History Of This Case

Shortly after this case was filed, Defendant notified the Court that it intended to seek dismissal of the matter on the basis that no case or controversy existed once Secretary Perez indicated that the new Commissioner would re-evaluate the agency's position regarding the application of the CSBA to Block. Commissioner Raskin took office on August 28, 2007, while this lawsuit was in its initial stages, but took no further action on the issues presented in this case while Defendant's Motion to Dismiss was pending before the Court. The parties

appeared before this Court on two occasions for argument on whether a case or controversy

existed under Article III of the United States Constitution.  In a Memorandum of Decision

issued on March 14, 2008, this Court concluded that a sufficient case or controversy exists

on the grounds that Block had standing to bring the suit and its claims were ripe at the time

the case was filed.  This Court further concluded that the subsequent actions of former

Commissioner Turnbaugh and Secretary Perez did not moot Block's claims for injunctive

relief.

### E.    Commissioner Raskin's Recent Advisory

On May 15, 2008, Commissioner Raskin issued an Advisory which is published on

the DLLR website (www.dllr.state.md.us) and attached hereto as Exhibit E. [2]  By its own

terms, the Advisory supersedes all prior statements, Press Releases, or other documents

which may be viewed as official interpretations of the Commissioner with regard to the

application of the CSBA to tax preparers that facilitate RALs on behalf of national banks and

federally chartered thrifts.   In essence, the Advisory reiterates some aspects of the previous

Commissioner's interpretation that entities, such as Block, which assist consumers to obtain

extensions of credit, in this case RALs, must be licensed under the CSBA if they receive

money or other valuable consideration from any party to the transaction.  The May 15, 2008

Advisory, however, differs in an important respect from the previous pronouncements of

---

[2]    A copy of the Advisory was also provided to opposing counsel via e-mail on May 18, 2008, and by facsimile and regular mail on May 19, 2008.

Commissioner Turnbaugh.  It specifically recognizes that enforcement of the prohibition in

CL § 14-1902(8) may interfere with the authority of national banks and federal thrifts to

export high interest rate loans into Maryland that would otherwise be illegal under this

State's law.  Accordingly, Commissioner Raskin concluded that:

> the interest rate prohibition set forth in § 14-1902(8) of the Act
> <u>will not be enforced against third-party agents of national banks</u>
> or federally chartered thrifts, when such agents are properly
> registered and regulated as electronic refund originators that
> assist consumers in obtaining RALs.

*Id.*   (Emphasis added.) The Advisory also makes it absolutely clear that "[a]ll other

provisions of the Act continue to be applicable to, and will be enforced against tax preparers

which facilitate RALs, even when such businesses act as agents of national banks or

federally-chartered thrifts."  *Id.*

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Fed. R. Civ. P., summary judgment as to any claim in the

Complaint is appropriate if there is no genuine issue of material fact, and the moving party

is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330

(1986).  For purposes of this standard, no genuine issue of fact exists if the non-moving party

fails to make a sufficient showing on an essential element of the case for which it has the

burden of proof.  *Id.* at 322-323.  "The summary judgment inquiry thus scrutinizes the [non-

moving party's] case to determine whether the [non-moving party] has proffered sufficient

proof, in the form of admissible evidence, that could carry the burden of proof of is claim at

trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).  In deciding a summary judgment motion, the Court shall view the facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party.  *Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

## ARGUMENT

Block contends that it is entitled to injunctive relief and a finding that the Maryland law is preempted for two reasons:  (1) that the National Bank Act (12 U.S.C. § 1 *et seq*.**)** and OCC regulations (12 C.F.R. Subpart D) preempt the general application of the CSBA to Block because it is acting as an agent of a national bank in connection with its facilitation of RALs in Maryland; and (2) that the same federal statute and regulations preempt the Commissioner's purported attempt to prohibit Block from facilitating loans which involve a national bank's exportation of interest rates that would otherwise be in violation of Maryland law.  For the reasons set forth below, Block's second claim (Count III of its Complaint) should be dismissed because it is now moot.  Furthermore, Block's first claim (Count II of its Complaint) should be denied because neither the National Bank Act, the OCC regulations, nor the relevant case law support its claim for preemption with regard to the application of the remaining aspects of the CSBA to Block.

A.    **The Commissioner's Recent Advisory Moots Block's Preemption Claim Pertaining To HSBC's Exportation Of The RALs' Interest Rate.**

Since Commissioner Raskin has now issued an Advisory which unequivocally

abandons any effort to enforce CL § 14-1902(8) to prohibit Block from assisting HSBC in the making of RALs that would exceed the Maryland interest rate cap, this Court should dismiss Block's preemption claim (Count III of the Complaint) for lack of subject matter jurisdiction because it is now moot.  Fed. R. Civ. P. 12(b)(1).  "To remain a justiciable controversy, a suit 'must remain alive throughout the course of the litigation, to the moment of final appellate disposition.'"  *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1088 (4th Cir. 1991)(citations omitted).  As the Fourth Circuit has recognized, an agency's "[w]ithdrawal or alteration of administrative policies can moot an attack on those policies," even where the challenged policies actually have been applied previously.  *Id.* at 1089 (citations omitted).  In *Bahnmiller,* the case was dismissed for mootness because events at the administrative agency since the filing of the lawsuit had "simply overtaken the pace of [the] litigation."  *Id.*  As this Court observed in its prior ruling, a "case becomes moot 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  Memorandum of Decision, March 14, 2008, at 18 (citing *Doe  v. Kidd*, 501 F.3d 348, 354 (4th Cir. 2007) and quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

The basis of Block's preemption claim in Count III is that former Commissioner Turnbaugh threatened enforcement of the prohibition in CL § 14-1902(8) against Block, and such enforcement would interfere with HSBC's right to use an agent to export an interest rate allowed by the bank's home state under § 85 of the National Bank Act.  It was this threat of action, or failure to forbear from action, that this Court previously relied upon to conclude

11

that the case was not moot.  Commissioner Raskin's May 15, 2008 Advisory effectively and conclusively eliminates any threat or perceived threat of enforcement of the interest rate prohibition in CL § 14-1902(8) against Block.  With this clearly articulated and publicly stated change in policy, that the "interest rate prohibition set forth in § 14-1902(8) of the Act will not be enforced against third-party agents of national banks,  . . ."  Block's preemption claim on this point is now moot.  Exhibit E (emphasis added).

This is true even under the "formidable burden" set forth in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.* 528 U.S. 167, 190 (2000), and referenced in this Court's Memorandum of Decision.  The Commissioner's official pronouncement in the May 15, 2008 Advisory makes it "absolutely clear [that] the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*  Therefore, Block's preemption claim under Count III of its Complaint must be dismissed because it is moot.

**B.     None Of The Other Requirements Of The CSBA As Applied
To Block Are Preempted By Either The National Bank Act
Or OCC Regulations.**

With the interest rate prohibition issue no longer viable, Block's only remaining preemption claim concerns the application of the other provisions of the CSBA to Block, an entity which is neither a national bank nor an operating subsidiary of a national bank.  As explained more fully below, there is absolutely nothing in the National Bank Act itself, the OCC regulations, or existing case law, including *Watters v. Wachovia Bank, N.A.*, 127 S.Ct. 1559 (2007), which supports Block's unprecedented attempt to abrogate the Commissioner's

reasonable attempts to protect Maryland consumers.  Requiring Block to comply with the

CSBA's basic requirements of licensing, obtaining a surety bond, and making certain

disclosures to consumers, does not, in any way, interfere with HSBC's "business of

banking."  Therefore, Block cannot meet its difficult burden of demonstrating preemption

with regard to Count II of its Complaint.

### 1.    General Principles Governing Preemption

Pursuant to the Supremacy Clause, U.S. Constitution, Art. VI, cl. 2, federal law may

preempt or displace state law through (1) express preemption, (2) field preemption, or (3)

conflict preemption.  *See Pacific Gas & Elec. Co. v. State Energy Resources Conserv. &

Develop. Comm'n,* 461 U.S. 190, 204 (1983).   Express preemption occurs only when

Congress explicitly defines the extent to which its enactment preempts state law.  *English v.

Gen. Elec. Co.,* 496 U.S. 72, 78-79 (1990).  In the absence of such explicit language, field

preemption may be inferred only when federal regulation in a particular field is "so pervasive

as to make reasonable the inference that Congress left no room for the States to supplement

it." *Id.* at 79.  Finally, if neither express nor field preemption applies, preemption may only

be implied when state law irreconcilably conflicts with federal law, or is such that the state

law "stands as an obstacle to the accomplishment and execution of the purposes and

objectives of Congress." *English v. Gen. Elec. Co.,* 496 U.S. 72, 79 (1990) (quoting *Hines

v. Davidowitz,* 312 U.S. 52, 67 (1941)).  In the area of national banking, conflict preemption

exists if the state regulation of a national bank "prevent[s] or significantly interfere[s] with

the national bank's exercise of its powers." *Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 33 (1996).

No matter which type of preemption is alleged, the courts must look to the intent of Congress in enacting the legislation, because "Congressional purpose is the 'ultimate touchstone' of preemption analysis." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992).

### 2.   The Presumption Against Preemption Of State Law

In *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996), the Supreme Court summarized the appropriate preemption analysis where state regulation has been extensive and longstanding, and reaffirmed "two presumptions about the nature of pre-emption."   First, "because the States are independent sovereigns in our federal system" federal courts "have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Id.* Second, proper "analysis of the scope of [a] statute's pre-emption is guided by our oft-repeated comment that '[t]he purpose of Congress is the ultimate touchstone' in every preemption case." *Id.* (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, (1963)). With these two guiding principles, and in the clear absence of any Congressional intent to preempt state regulation of non-bank state-chartered corporations that act as agents of national banks, this Court should be very reluctant to find that Block has rebutted the

14

presumption against preemption.[3]

In the absence of a specific pronouncement of congressional intent, courts are reluctant to infer preemption, and the party claiming preemption bears the burden of proving that Congress, in fact, intended to preempt state law. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 132 (1978); *New York Dept. of Social Services v. Dublino*, 413 U.S. 405, 413 (1973). The courts apply a presumption against preemption in areas traditionally regulated by the states, and "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Sante Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). The Supreme Court has "never assumed lightly that Congress has derogated state regulation, but instead ha[s] addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield v. Travelers Ins. Co.,* 514 U.S. 645, 654 (1995).

As explained more fully below, there is nothing in the National Bank Act itself that supports preemption of the CSBA, as applied to a corporation that is neither a bank nor an operating subsidiary. Nor do the OCC regulations, which are comprehensive and extensive in their breadth and application to both national banks and their operating subsidiaries, assert any preemptive effect with regard to an entity such as Block, which is merely an agent of and

---

[3]     Although Block suggests a contrary view of the presumption, Memo. at 18, n. 12 (citing *Watters*, 127 S.Ct. at 1567), it would be inappropriate to extend such reasoning to entities such as Block, which are not national banks or wholly owned subsidiaries.

15

business partner with a national bank.  Finally, as a review of the relevant case law reveals, on balance, even those cases cited by Block support a conclusion that the CSBA is not preempted by federal law.

### 3.  The Plain Words Of The National Bank Act Do Not Support A Finding Of Preemption In This Case.

Block cannot point to any section of the National Bank Act to support its argument that "imposing such restrictions [under the CSBA] in the context of RALs is contrary to provisions under the NBA." Memo. at 17.   Other than the provisions of the National Bank Act that impact HSBC's exportation of the excessive interest rate for its RALs, which is now moot, there are no provisions of the Act that support Block's assertion of complete preemption.  Although Block correctly argues that "State laws regulating national banks must not conflict with federal law," Memo. at 10, other than the anti-usury provision of CL § 14-1902(8), which is no longer at issue, there is nothing in the CSBA that conflicts with the National Bank Act or significantly interferes with the business of banking.  *Cf. National City Bank of  Indiana v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006), *cert. denied,* 127 S.Ct. 2096 (2007) (preemption found where the Maryland statute restricted prepayment penalties on mortgage loans, but a specific OCC regulation placed no limitations on such fees).  Moreover, Block cannot point to any provision of the CSBA that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67.  Indeed, nowhere in the National Bank Act does Congress suggest that the OCC should have exclusive regulatory authority over third-party agents of national banks.

16

Nor is there anything in the National Bank Act that precludes States from requiring third-party agents of national banks to obtain a license, secure a bond, and make certain disclosures, when such entities facilitate loans on behalf of the bank.  Without such a conflict, which must arise from the National Bank Act itself (or duly authorized and promulgated regulations implementing it), there can be no conflict preemption.

Block's assertion that "[a]ny state law that impairs a national bank's ability to engage in the 'business of banking' conflicts with the general purpose of the NBA, and may not stand" (Memo. at 13) is simply too broad and incorrect.  Mere "impairment" is not enough.  There must be "significant interference" and it must impact the national bank, not just its agents.  *See e.g., Barnett Bank*, 517 U.S. at 33.  It is simply not enough for Block to claim that since HSBC is authorized to use agents to exercise its incidental powers under 12 U.S.C. 24 (Seventh), it necessarily follows that Block is thus shielded from all state regulation in the same manner as the bank itself.  Block cannot point to any provision in the National Bank Act to support such a claim.  The issue is not whether the federal enabling statute allows banks to use agents, but the extent to which Congress intended to preempt state laws such as the CSBA, which regulate state-chartered corporations that are neither banks nor wholly owned operating subsidiaries.  Without any specific statutory language or any indicia of

17

congressional intent, Block cannot support its bold and unprecedented preemption claim.[4]

> **4. *Watters v. Wachovia* Provides No Support For A Conclusion That The Actions Of Third-party Agents Of National Banks Are Entitled To The Preemptive Reach Of The National Bank Act.**

Block grossly exaggerates the scope of *Watters* when it contends that "a state law that restricts the power of a national bank is preempted by the NBA, even when that power is only carried out by a third party." Memo. at 14. In *Watters,* 127 S.Ct. at 1564-5, by a 5-3 majority, the Supreme Court held that "Wachovia's mortgage business, <u>whether conducted by the bank itself or through the bank's operating subsidiary</u>, is subject to the OCC's superintendence, and not to the licensing, reporting, and visitorial regimes of the several States in which the subsidiary operates." (Emphasis added.) In citing liberally from *Watters*, Block ignores the primary rationale for the Supreme Court's decision. In fact, the Court relied almost exclusively on the underlying premise that it has "<u>treated operating subsidiaries as equivalent to national banks</u> with respect to powers exercised under federal law (except where federal law provides otherwise)." *Id.* at 1570-1 (emphasis added) (parenthesis in original). The question presented before this Court, therefore, is whether it is prepared, in the absence of any binding judicial authority, and any language in the National Bank Act

---

[4]      Block's lack of support for this argument is further highlighted by its unsubstantiated claims such as "the state has no basis to alter such contractual provisions because regulation and control is strictly within the province of Congress and the OCC." Memo. at 17. Block, however, cites to no statutory or regulatory provision which specifically address RALs. Neither Congress nor the OCC has spoken on this issue. Therefore, preemption cannot be presumed or inferred.

itself, to extend the holding in *Watters* to corporate entities such as Block that are clearly not subsidiaries of the bank.  Despite Block's suggestions to the contrary, there is nothing in *Watters* that supports such a giant step in abrogating the consumer protection laws of the sovereign States.

Throughout the majority opinion, the Court in *Watters* made it absolutely clear that operating subsidiaries were to be treated as one and the same as the national bank for regulatory purposes because its subsidiaries are limited to conducting the same activities which the bank itself may conduct.  The Court noted that the "OCC licenses and oversees national bank operating subsidiaries just as it does national banks," and "[f]or supervisory purposes, OCC treats national banks and their operating subsidiaries as a single economic enterprise.  Comptroller's Handbook 64."  *Id*. at 1569-70 (emphasis added) .  Citing further to the OCC Handbook, the Court concluded that the "OCC oversees both entities by reference to 'business line,' applying the same controls whether banking 'activities are conducted directly or through the operating subsidiary.'" *Id.*  This unique and overlapping relationship, which was the fundamental rationale for the Court's decision, simply does not exist between Block and HSBC, the national bank for whom it acts as an agent.  Block is not authorized under the National Bank Act to do what the bank can do.  In fact, as Block readily asserts, HSBC is prohibited from acting in the role that Block fulfills as an ERO, and the bank may only make RALs with the assistance of an ERO.  *See* Complaint ¶ 4.  Moreover, unlike the situation presented in *Watters*, the OCC has virtually no role in regulating Block.

*See* discussion *infra* at 22.  Certainly, there is no assertion here that the OCC treats HSBC and Block as a "single economic enterprise."

The Supreme Court's emphasis on the nature of this unique relationship between the bank and its operating subsidiaries cannot be overstated.  Time and again, throughout the opinion the Court came back to this theme.  In discussing the "[s]ecurity against significant interference by state regulators," the Court noted that such "security should adhere whether the business is conducted by the bank itself or is assigned to an operating subsidiary licensed by OCC whose authority to carry on the business <u>coincides completely</u> with that of the bank." *Id.* at 1571 (citation omitted) (emphasis added).  Finally, the Court concluded: "The NBA is thus properly read by OCC to protect from state hindrance a national bank's engagement in the 'business of banking' whether conducted by the bank itself or by an operating subsidiary, empowered to do only what the bank itself could do." *Id.* at 1572.

Block is a third-party tax preparer.  It is neither a national bank nor a subsidiary of a national bank. Therefore, the holding in *Watters* does not support Block's preemption argument, and any extension of *Watters* to the situation presented here would be unwarranted.  In that regard, the actual text of *Watters* offers no support for Block's suggestion that "a state law that restricts the power of a national bank is preempted by the NBA, even when that power is only carried out by a third party." is without merit. The rationale of *Watters* is especially inapt here, since Block is exercising a power (originating RALs) that neither a national bank nor its operating subsidiary is legally permitted to

20

undertake.  For these reasons, reference to *Watters* is misplaced and provides no support for Block's preemption claim.

### 5.    The OCC Regulations Cited By Block Do Not Support A Finding Of Preemption In This Case.

In the absence of any statutory authority, Block relies heavily on OCC regulations to support its preemption claim and its suggestion that the OCC has exclusive visitorial power over agents of national banks.  While it is true that OCC regulations permit national banks to use agents to originate loans, *see* 12 C.F.R. §§ 7.1003(b) and 7.1004(a), it does not necessarily follow that state regulatory action against those agents is preempted.  In fact, the OCC's own regulations support a contrary conclusion because they make it clear, under Subpart D - Preemption, that agents of national banks are not treated as equivalent to operating subsidiaries of national banks.  The preemptive regulation at issue in *Watters* was 12 C.F.R. § 7.4006, which provides: "Unless otherwise provided by Federal law or OCC regulation, State laws <u>apply to national bank operating subsidiaries</u> to the same extent that those laws apply to the parent national bank."  (Emphasis added.)  Simply put, there is no similar OCC regulation declaring the preemptive effect of the National Bank Act and OCC regulations as they pertain to agents of national banks.

Certainly, if the OCC thought it had the statutory authority to extend its exclusive regulatory authority to mere agents of national banks, in derogation of all state consumer protection laws, it could have done so, just as it did with regard to operating subsidiaries. Indeed, the OCC is not shy in making regulatory declarations of its own preemptive power.

21

Nor is the OCC shy in joining litigation on the side of national banks and their operating subsidiaries to assert and protect its exclusive regulatory authority. *See e.g.*, *Watters, supra*.; *National City Bank of Indiana v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006), *cert. denied* 127 S.Ct. 2096 (2007); *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005), *cert. denied* 127 S.Ct. 2093 (2007); *Wells Fargo Bank, N.A. v. Boutris*, 419 F.3d 949 (9th Cir. 2005). Here, however, the OCC has chosen to do nothing.  It has not promulgated a regulation, subject to public notice and comment, asserting preemptive authority over third-party agents of national banks.

Moreover, the lending provisions of the OCC regulations cited by Block, including 12 C.F.R. §§ 7.4008(d)(2) and 7.4009, do little to support its claim of preemption.  By their very terms, these regulations are restricted in application to the national bank itself, and cannot be read to extend to agents of national banks, in the absence of any language in the regulations, statutory authority, or "clear and manifest" congressional intent.  Section 7.4008(d)(2) provides that a "<u>national bank</u> may make non-real estate loans without regard to state law limitations concerning : (i) Licensing, registration (except for purposes of service of process), filings, or reports by creditors . . ."  (Emphasis added.)  The Commissioner, by virtue of her recently issued Advisory, has made it clear that she is not imposing any interest-rate limitations on HSBC, the national bank that makes the loans.  Nor is the Commissioner restricting Block from originating RALs that would otherwise be illegal under Maryland law. Nor does the imposition of a licensing requirement on Block, a third-party non-bank tax

22

preparer, run afoul of § 7.4009, because its exact terms are limited to national banks, in distinct contrast to § 7.4006, which includes operating subsidiaries in the subset of business entities that are entitled to the preemptive shield of the OCC.  Again, if the OCC wanted to extend this preemptive shield to agents such as Block, the OCC is well aware of how it may lawfully attempt to accomplish this objective.  Since the OCC has not done so, Block's reliance on § 7.4008(d)(2) and the other OCC regulations it cites is misplaced and does not support its claim of preemption.  This Court should not permit Block to accomplish through mere argument what Congress and the OCC have chosen not to do in actuality.

Block argues that the OCC's oversight authority comes from the contractual agreement between Block and HSBC.  Memo. at 6 (citing Schmidt Decl. ¶ 10 and Block Ex. A §§ 11.2 and 11.3).  On the contrary, no contractual agreement between parties can vest a federal regulatory agency with powers that have not been granted to it by Congress through its enabling statute.  As discussed above, there is nothing in the National Bank Act that gives the OCC exclusive regulatory authority over agents of national banks.  Nor has the OCC asserted, through regulations, that authority.

Finally, the OCC itself, in recent communications with the State of Maryland has affirmatively recognized its lack of authority over Block.  On April 2, 2008, pursuant to the federal Freedom of Information Act, 12 U.S.C. § 552, the Office of the Attorney General requested from the OCC "all documents relating to the licensing or regulation of H&R Block Eastern Enterprises, Inc."  See letter of April 2, 2008, from Assistant Attorney General

Christopher J. Young to the OCC Disclosure Officer attached hereto as Exhibit F.   This

request included "any documents relating to complaints, investigations, audits or visits to

[Block's] offices. *Id.*  The official OCC response came from Jacqueline J. England, Senior

FOIA Specialist in a letter dated May 5, 2008, and stated: "<u>the company cited in your request</u>

[H&R Block Eastern Enterprises, Inc.] <u>is not an entity regulated by the Office of the</u>

<u>Comptroller of the Currency (OCC)</u>."   Exhibit G (emphasis added).   The message and

conclusion could not be more clear: the OCC does not have, and does not claim to have the

regulatory authority on which Block depends for its preemption argument.  Thus, the OCC's

candid acknowledgment that it does not regulate Block further confirms that:  (1)  the OCC

regulations cited by Block do not conflict in any manner with the remaining sections of the

CSBA which the Commissioner seeks to enforce; and (2) the OCC does not have exclusive

regulatory authority over Block, if indeed, it has any at all.   Without such conflict or

significant interference, this Court cannot find preemption.

### 6.   The OCC And OTS Opinion Letters Cited By Block Provide No Support  For Its Preemption Claim.

Block's reliance on opinion letters from the OCC and its sister regulator, the Office

of Thrift Supervision ("OTS") is also misplaced.  First, there is a divergence of views on

whether such agency pronouncements are entitled to any deference.  Block cites to *State*

*Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207, 216-220 (D.Conn. 2006), for the

proposition that a court should give controlling deference to an agency opinion letter on

preemption.  Memo. at 16, n. 10.  Block, however, ignores *State Farm Bank, F.S.B. v.*

24

*Reardon*, 512 F. Supp. 2d 1107 (S.D. Ohio 2007), in which the court expressed the exact opposite opinion.

The approach taken by the Federal District Court for the Southern District of Ohio in *Reardon* is the more reasoned approach and the path this Court should follow. In *Reardon*, the court was called upon to decide whether the OTS "lawfully preempted, in part, Ohio law requiring independent mortgage brokers to obtain licenses from the State before marketing first and second mortgages." *Id.* at 1111. In denying State Farm's summary judgment motion, the court concluded that while the OTS "may have the authority to extend federal preemption to agents of federal depository institutions, it has failed to comply with the Administrative Procedure Act" in promulgating an appropriate regulation, subject to notice and comment. *Id.* A similar situation exists here because the OCC has not promulgated any regulations addressing the issue of preemption of state laws as they apply to agents of national banks.[5]

The reasoning of the court in *Reardon* is quite compelling. In evaluating the OTS regulations, which are substantially similar to the OCC regulations in issue, the court ruled that an OTS Opinion Letter, which found preemption of state licensing laws applying to agents of federal thrifts, could not be accepted by the court as binding or entitled to any deference in view of the inconsistent agency regulations. As the court noted, "[t]he

---

[5]    Even if this Court should find otherwise, the Commissioner does not concede that the OCC has the statutory authority to issue such regulations.

25

regulations at issue here do not address or even mention the scope of OTS' authority over third-party independent contractors." *Id.* at 1126.  The same is true with regard to the OCC regulations in this case: the regulations do not allude to any OCC authority over third party agents or contractors, such as Block.  Furthermore, the court discussed in detail how the OTS regulations do apply to operating subsidiaries which "notably are majority-owned and controlled by the parent savings association," and that a "subsidiary, to be excluded from state regulation, must have the majority of its stock owned by the federal savings associations." *Id.* at 1126-27.  As the court highlighted, that was not the case in *Reardon*, because the bank did "not have any ownership interest in the independent insurance agencies which are to solicit mortgages under the proposal reviewed by the [OTS]." *Id.* at 1127.  As the court further emphasized, "[t]he distinction is an important one.  Federal savings associations exercise direct control over operating subsidiaries, service companies, and affiliates.  The same is not true as to third-party agents." *Id.*  Again, this rationale is entirely consistent with the approach taken by the Supreme Court in *Watters,* and has direct application to the undisputed facts presented to this Court.

Reardon provides an analysis which is substantially analogous to that which this Court should adopt in determining whether to give any deference to the OCC and OTS opinion letters cited by Block.  Just as the court concluded in *Reardon* in relation to the OTS regulations in issue, the OCC regulations here "[do] not mention third party contractors or exclusive agency agreements." *Id.* at 1127-28.  Therefore, only "properly promulgated,

26

substantive agency regulations have the 'force and effect of law' necessary to 'pre-empt state law under the Supremacy Clause.'" *Id*. at 1125 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979)) (citations omitted).  Since no such OCC regulations preempt state action against agents of national banks, both the OCC and OTS interpretive opinion letters cited by Block are unpersuasive and should not be the basis for preempting the consumer protection laws of the State of Maryland.

> **7.    The Other Cases Cited By Block Do Not Support Its Preemption Claim.**

Block correctly notes for this Court that the Federal District Court for the District of Connecticut was faced with a case "remarkably similar to this matter" in *Pacific Capital Bank v. Connecticut*, 2006 WL 2331075 (D. Conn. Aug. 10, 2006).  Memo. at 14. In describing the holding in that case, however, Block reveals only that part of the decision favorable to its argument.  In *Pacific Capital*, the court was asked to rule that a Connecticut law regulating facilitators of RALs was entirely preempted.  Although the district court did find preemption with regard to Connecticut's attempts to regulate the exported interest rate of the RALs by making it illegal for facilitators to arrange such loans, the court specifically found that two aspects of the law were <u>not</u> preempted.  One provision, Conn. Gen. Stat. § 42-480(b) (2006), provides: "At the time a borrower applies for a refund anticipation loan, a facilitator shall disclose to such borrower on a document that is separate from the loan application [various information designed to educate the borrower about the cost and nature of the loan]."  The court explicitly concluded that "this language does not conflict with the

27

NBA." *Id.* at * 7.  The court further stated that the provision "does not in any way prevent Plaintiff or other national banks from setting the interest rate they desire for their loans" and the bank could not "point[ ] to any section of the NBA that gives it the right to withhold the information outlined in the statute." *Id*.  Finally, the *Pacific Capital* court concluded that the section of the Connecticut law in question did "not significantly interfere with Plaintiff's rights under the NBA." *Id.*

Pacific Capital* also found no preemption, as applied to RAL facilitators, regarding another provision of the law:  the section which restricted the making of RALs to locations where the principal business is tax preparation.  The court construed the statute to prohibit Connecticut from preventing national banks from offering RALs at it own branches, but recognized that Connecticut could, for instance, prevent a facilitator from offering RALs at a used car dealership.  The court concluded that such a "construction would not conflict with the NBA." *Id.* at * 7.

On balance, therefore, *Pacific Capital* provides considerable support for the conclusion that aside from the limitation on exporting interest rates, what remains of the CSBA is not preempted and may be enforced against Block, because it does not significantly interfere with the powers of the national bank itself.   This conclusion is further buttressed by the principal that "[i]f a state statute must be invalidated in a preemption case such as this, state law is displaced only 'to the extent that it actually conflicts with federal law.'" *Id*. at * 9 (citing *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. and Develop. Comm'n,*

461 U.S. 190, 204 (1983)).  This Court should do exactly what the court did in *Pacific Capital*: conclude that there is no preemption with regard to all of the remaining provisions of the CSBA (other than CL 14-1902(8)) because the law regulates a non-bank third party agent and does not significantly interfere with the business of banking.

Finally, Block's reliance on the "gift-card" cases to support its preemption claim ignores the conflicting holdings of the two cases.  Block cites liberally from *SPGGC, LLC v. Ayotte*, 488 F.3d 525 (2d Cir. 2007), *cert. denied*, 128 S.Ct. 1258 (2008), which admittedly supports its position in adopting a sweeping and unprecedented extension of preemption to include the acts of agents of national banks.  Block, however, barely mentions *SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007), and when it does, it suggests to this Court that *Blumenthal* also supports a finding of complete preemption.  In fact, quite the opposite is true.

*Blumenthal* concerned a Connecticut law that prohibits the sale of prepaid gift cards that are subject to inactivity fees and/or expiration dates.  SPGGC, a non-bank corporation, challenged the law, claiming that it was preempted by the National Bank Act because it prevented SPGGC from selling gift cards that were issued by a national bank.  The district court dismissed the case for failure to state a claim, and SPGGC appealed.  *See SPGGC, Inc. v. Blumenthal*, 408 F. Supp. 2d 87 (D.C. Conn. 2006).  On appeal, the Second Circuit affirmed in part, vacated in part, and remanded the case to the district court.

With regard to the prohibition on inactivity fees, the Second Circuit affirmed the

29

district court's determination that the prohibition was <u>not</u> preempted by the National Bank

Act. *Blumenthal*, 505 F.3d at 191.  In analyzing the issue, the court considered whether the

prohibition regulated SPGGC's conduct or that of the national bank.  Although the OCC has

authorized national banks to issue gift cards, and the cards were issued by a national bank,

SPGGC's complaint made clear that it was SPGGC that established and collected the fees

associated with the cards.  Under these circumstances, the Second Circuit concluded that the

prohibition on inactivity fees did "not interfere with [the national bank's] ability to exercise

its powers under the NBA and OCC regulations.  Rather, it affects only the conduct of

SPGGC, which is neither protected under federal law nor subject to the OCC's exclusive

oversight." *Id.*  Accordingly, the *Blumenthal* court concluded that the National Bank Act did

not preempt the prohibition on inactivity fees.

With regard to the prohibition on expiration dates, the court concluded that it could

not determine whether preemption applied without further factual development of the issue.

Therefore, the court vacated and remanded this aspect of the district court's decision.  *Id.* at

192.

Most significantly for this case, *Blumenthal* expressly <u>rejected</u> the argument, made

by Block in the present case, that for purposes of National Bank Act preemption, it does not

matter whether the entity being regulated by state law is a bank or a non-bank third party.

*Id.* at 190.  The Second Circuit concluded that the identity of the regulated party <u>does</u> matter

because the National Bank Act does not grant any special status to bank-nonbank

30

relationships.  *Id.*  In this regard, the court specifically rejected the notion of extending *Watters* to cover agents of national banks.  Instead, Blumenthal expressly states: "[w]e believe that it would be a mistake to read *Watters* so broadly as to obscure the unique role assigned to operating subsidiaries in the context of national banking regulation."  *Id.* Confirming that operating subsidiaries enjoy a special relationship with national banks, sanctioned by Congress, the Second Circuit concluded: "the authority of national banks to do business through operating subsidiaries is itself a power that Congress granted to the banks through the NBA.  By contrast, the relationship between [the national bank] and SPGGC enjoys no special status under the statute."  *Id*.  Likewise, in this case, the relationship between the bank and Block, a third-party tax preparer,  enjoys no special status under the National Bank Act.  Therefore, this Court should adopt the same approach as the Second Circuit in *Blumenthal*.  It is faithful to and consistent with a plain reading of the National Bank Act, the OCC regulations, and *Watters*, none of which express or support preemption of a state consumer credit statute such as the CSBA as it applies to Block.

Contrary to Block's assertions, the limited criminal sanctions in the CSBA do not bolster its preemption argument. In view of the Commissioner's recent Advisory, *Pacific Capital Bank, N.A. v. Milgram*, 2008 WL 700180 (D.N.J. 2008), cited by Block, is no longer relevant to the case before this Court.  In *Milgram*, the court held that the provisions of a New Jersey law that made it a crime for national banks and their agent tax preparers to offer RALs at an interest rate exceeding 30% were preempted by the National Bank Act.  Since

the Commissioner will not enforce CL § 14-1902(8), or regulate that aspect of the transaction, the holding in *Milgram* has no significance or application to the facts presented in this case.

Moreover, Block's citation to *Easton v. Iowa*, 188 U.S. 220 (1903), is also of no relevance here. *Easton* dealt specifically with a national bank and its own manager, not a third-party agent such as Block. Accordingly, the limited criminal provision in the CSBA would never involve any aspect of HSBC's exportation of otherwise illegal interest rates to Maryland consumers. Nor would the Commissioner attempt to pursue criminal sanctions against Block for its involvement related to the bank's export of the interest rate of its home state.

### C.   The Tenth Amendment Precludes Reliance On OCC Regulations To Find Preemption In This Case.

The Tenth Amendment stands as a further bar against improper extensions of preemption to abrogate consumer protection laws enacted by state legislatures. Adopted by the Framers as a protection against federal encroachment upon state sovereignty and individual rights, the Tenth Amendment requires that whatever governmental authority is neither delegated by the Constitution to the federal government "nor prohibited by it to the States" must be "reserved to the States respectively, or to the People." The Tenth Amendment is violated by regulations of the OCC to the extent that such regulations purport to preempt state laws, as applied not only to national banks but to state-chartered corporations that are agents of the banks.

32

States' authority over corporations chartered under state corporation laws and states'
regulation of foreign corporations doing business within their borders are fundamental
aspects of state sovereignty.  So too, is the police power of the State exercised for the
protection of its citizens against abusive predatory lending practices.  The Tenth Amendment
constitutes a bar against federal agency efforts to preempt these sovereign attributes where,
as here, the administrative preemption is asserted by Block in the absence of "explicitly
conferred" statutory authority, *Hopkins Fed. Sav. & Loan v. Cleary*, 296 U.S. 315, 336-37
(1935), or other clear manifestation of congressional intent to preempt.  Here, far from acting
pursuant to any such authority, Block argues in favor of OCC preemption even in the absence
of the type of preemptive regulation that was present in *Watters, supra*.

The presumption against preemption articulated by the Supreme Court in *Santa Fe
Elevator*, 331 U.S. at 230, and its progeny admonishes courts against finding that historic
state police powers have been superseded "unless that was the clear and manifest purpose of
Congress."  Under proper application of the Tenth Amendment, this presumption against
preemption of state laws warrants heightened emphasis in cases of purported preemption by
a federal agency.  Absent clear congressional authorization, such administrative preemption
takes place outside the political process safeguards of federalism, which the Supreme Court
identified in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528 (1987), as
the primary source of the States' Tenth Amendment protection.  Fundamental to those
political process safeguards is political accountability to the electorate, which is present when

33

Congress and the President together enact laws but absent when federal agencies make law by rulemaking.  Especially in light of the Supreme Court's insistence that Congress provide a "clear statement" to overcome the presumption against preemption, *Gregory v. Ashcroft*, 501 U.S. 452, 460-464 (1991), the political process safeguards that give meaning to the Tenth Amendment demand unmistakably clear evidence of congressional authorization before agency preemption can be upheld.  No such evidence exists in the case of the OCC regulations which Block cites in support of its effort to preempt the Maryland CSBA.

*Garcia's* political process safeguards inform the interpretation of the Supremacy Clause, U.S. CONST. art. VI, cl. 2, pursuant to which only three categories of federal law constitute the "Supreme Law of the Land."  Agency rulemaking is not among them.  Not designed to represent the interests of the States, and unfettered by the requirements of bicameralism and presentment that the Supreme Court has insisted be observed for statutes to qualify as "Laws of the United States" within the meaning of the Supremacy Clause, federal agencies may only enjoy preemptive authority for their regulations in two circumstances: (1) when Congress, in compliance with the requirements of Article I, Section 7, has expressly delegated preemptive authority to the agency, or (2) when in compliance with those same requirements, Congress has enacted an expressly or impliedly preemptive statute that the agency is merely interpreting.  The OCC regulations cited by Block do not meet either of those requirements.  Hence, they do not preempt the CSBA as it applies to Block.

34

## CONCLUSION

For the reasons stated above, this Court should enter a judgment finding that Block's

preemption claim under Count II is denied in all respects, and its preemption claim under

Count III is dismissed because it is moot.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

_____/s/_____
Jonathan R. Krasnoff (Bar No. 07880)
Assistant Attorney General
Maryland Office of the Attorney General
500 N. Calvert Street, Suite 406
Baltimore, Maryland  21202-3651
Phone No. (410) 230-6123
Fax No. (410) 333-6503
Email Address:  jkrasnoff@dllr.state.md.us
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Partial Motion to Dismiss and Cross

Motion for Partial Summary Judgment and Supporting Memorandum (including Exhibits)

were served on all counsel of record via the Court's ECF/CM system this 30th day of May,

2008.

_____/s/_____
Jonathan R. Krasnoff
Assistant Attorney General

35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

H&R BLOCK EASTERN                    *
ENTERPRISES, INC.,
                                     *
              Plaintiff,
                                     *          Case No. MJG-07-1822
        v.
                                     *
CHARLES W. TURNBAUGH, in
    his official capacity as         *
    Commissioner of Financial
    Regulation,                      *

              Defendant.             *

        *       *       *       *       *       *       *       *       *


## <u>EXHIBITS</u>

A.      House of Delegates Floor Report on HB 472

B.      January 4, 2007 letter from Commissioner Turnbaugh to Mark A. Ernest

C.      Press Release of January 9, 2007

D.      July 18, 2007 letter from Secretary Perez to Brian H. Schmidt

E.      May 15, 2008 Advisory

F.      April 2, 2008 letter from Christopher J. Young to OCC Disclosure Officer

G.      May 5, 2008 letter from Jacqueline J. England to Christopher J. Young